# United States Court Of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-4143

_____

United States of America,          *
                                   *
        Plaintiff-Appellee,        *
                                   *    Appeal from the United States
    v.                             *    District Court for the Eastern
                                   *    of Arkansas
Kenneth Wayne Beck,                *
                                   *
        Defendant-Appellant.       *

_____

Submitted:  March 10, 1998

Filed: April 6, 1998

_____

Before MCMILLIAN and FAGG, Circuit Judges, and BENNETT,[*] District Judge.

_____

BENNETT, District Judge.

    Defendant Kenneth Wayne Beck was convicted following a jury trial of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §

_____

[*] The HONORABLE MARK W. BENNETT, United States District Judge for the Northern District of Iowa, sitting by designation.

841(a)(1), and was sentenced to 121 months imprisonment.  He appeals the denial of his motion to suppress evidence seized by law enforcement officers during a search of his rental car following a traffic stop.

We reverse.

## I.  FACTUAL BACKGROUND

### A.  Lack of Factual Findings

The district court here made only limited factual findings on the record, in all likelihood because the facts of this case are uncontested. Ordinarily, Rule 12(e) of the Federal Rules of Criminal Procedure requires that we remand a case to the district court when the district court has failed to set out its factual findings underlying its decision on a motion to suppress.  *See generally United States v. Bloomfield*, 40 F.3d 910, 913-14 (8th Cir. 1994) (*en banc*), *cert. denied*, 514 U.S. 1113 (1995).  However, here, because the relevant facts in this case are undisputed, we need not remand for further findings and may rule based on the record currently before us.  *See United States v. Ali*, 86 F.3d 275, 276 (2d Cir. 1996) (holding that remand is unnecessary where "there is an abundance of undisputed facts" regarding the circumstances surrounding defendant's interrogation); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993) (holding that remand unnecessary where the district court made no finding as to evidence was sufficient to support a reasonable suspicion because the relevant facts were undisputed); *United States v. Williams*, 951 F.2d 1287, 1288 (D.C. Cir. 1991) (recognizing that "there are cases in which the facts are so certain, and the legal consequences so apparent, that little guesswork is needed to determine the grounds for the ruling."); *cf. Bloomfield*, 40 F.3d at 914 (holding remand unnecessary and that this court will uphold a district court's decision on a motion to suppress despite lack of

factual findings if, on review of the record, it finds that "any reasonable view of the evidence" supports the district court's decision). We turn next to the uncontested facts of this case.

### B. Uncontested facts

The uncontested testimony at the suppression hearing reveals the following. On November 12, 1996, Officer Joe Taylor of the Conway, Arkansas, Police Department was patrolling Interstate 40 when he observed a green Buick with California license plates following another vehicle too closely. Officer Taylor proceeded to pull the green Buick over for the observed traffic infraction. Officer Taylor approached the automobile's passenger side and asked the driver, defendant Beck, for his license and rental agreement. Officer Taylor explained to Beck the reason for his being stopped. While talking to Beck, Officer Taylor observed that Beck appeared nervous since his hands were shaking and he was looking around. Officer Taylor also saw "fast food trash" on the Buick's front passenger floorboard. While Officer Taylor observed a briefcase in the rear of the automobile, he did not see any luggage in the car's passenger compartment. Officer Taylor did not observe any evidence that Beck was under the influence of drugs or intoxicants.

Officer Taylor returned to his patrol car and ran a check on Beck's driver's license and a criminal history check for Beck. These inquiries revealed that Beck's driver's licence was valid, and that he had no criminal history. Following these checks, Officer Taylor returned to the passenger side of Beck's Buick and handed back Beck's driver's license and rental agreement. Officer Taylor gave Beck a verbal warning for following another motor vehicle too closely and then told Beck he was free to go. Officer Taylor then turned, started to walk back to his patrol car before stopping and

3

asking Beck if he had any guns, drugs, or knives in his automobile. Beck turned, stared out the window, and said, "No." Officer Taylor then asked Beck if he could conduct a quick search of Beck's Buick. Beck became more nervous and asked Officer Taylor why he wanted to search his automobile. Beck told Officer Taylor that he was just trying to get to North Carolina for a job. Officer Taylor responded by telling Beck that he was just trying to ascertain if Beck had any firearms or drugs in the car. Beck again replied, "No, no." Beck and Taylor engaged in further discussion over why Officer Taylor wanted to search Beck's automobile. Officer Taylor, in Beck's presence, radioed for Officer Tom Knopp, who is a K-9 officer, to assist him at the scene. Officer Knopp, who had been monitoring police radio transmissions, was already on his way to the scene of the stop with his drug dog, King.[1]

After calling for Officer Knopp, Beck and Officer Taylor resumed their colloquy concerning Beck's consent to a search of his automobile, with Beck wanting to know what would happen if he refused to consent. Officer Taylor answered Beck's question by telling him that while no search would occur, a drug dog would be led around the outside of Beck's Buick. Beck then replied, "Well, no." At this juncture, Officer Knopp and his drug dog arrived on the scene. Officer Taylor motioned to Officer Knopp that he wanted Officer Knopp to get King out. Officer Taylor then instructed Beck to get out of his automobile and to stand to the side of the car. Beck complied with Officer Taylor's instructions and exited the Buick. Officer Knopp removed King from his patrol car and permitted the dog to have a drink of water and to relieve himself along the roadway before bringing him to Beck's Buick. King was led around Beck's

---

[1]Officer Taylor, whose assignment was that of a drug interdiction officer for the Conway Police Department, usually has a drug dog in his squad car, but did not on the day he stopped Beck because he was patrolling in a spare squad car. Tr. at 11.

automobile and he alerted to the rear door on the passenger side of the Buick. Officer Taylor informed Beck of his constitutional rights, as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and inquired whether Beck had anything illegal in the car. Beck answered "yes," and indicated toward his briefcase. A search of Beck's briefcase revealed several plastic baggies that contained a whitish-tan residue on them which subsequently tested positive for methamphetamine. Beck was placed under arrest and a search of his person revealed a small plastic baggie which appeared to contain methamphetamine.

The officer then removed the contents from the Buick's trunk and placed King inside the trunk. King did not alert in the trunk nor to the items removed from the trunk. Due to inclement weather, Officer Taylor had the Buick removed from the side of the highway to a wrecker yard. At the wrecker yard, during a search of the Buick and its contents, the police discovered additional quantities of methamphetamine in the briefcase and hidden in the car's trunk.

## II. DISCUSSION

### A. Procedural Background

Defendant Beck timely moved to suppress the methamphetamine. Following an evidentiary hearing, the district court denied Beck's motion to suppress from the bench. The district court concluded that Beck was not detained after being told by Officer Taylor that he was free to go. The district court further found, although "barely so," that Officer Taylor, from his observations of both Beck and his rental car, developed reasonable suspicion to detain Beck.

On appeal, Beck challenges the district court's denial of his motion to suppress, arguing that the methamphetamine should have been excluded because the search that

5

uncovered it was the tainted fruit of an unreasonable detention. Appellee United States counters that the district court was correct in its denial of the defendant's motion to suppress because Officer Taylor, who had stopped the defendant's automobile for a routine traffic infraction, developed reasonable suspicion to detain Beck in order to permit a dog sniff of his automobile. Defendant Beck further asserts that the inventory search of his automobile was invalid. The United States contends that this issue was not properly preserved for appeal and that there was no plain error in the district court's admission of evidence found in Beck's automobile during the inventory search.

Thus, in this appeal, we must initially determine whether asking Beck to step from his motor vehicle, after the completion of a valid stop for a traffic violation, in order to await a drug dog sniff of his automobile, constitutes a seizure within the purview of the Fourth Amendment. If such actions do give rise to a seizure within the scope of the Fourth Amendment, we are also called upon to determine the issue of whether the law enforcement officers here possessed reasonable suspicion to detain Beck in order to conduct the dog sniff of his automobile. We begin by addressing the constitutionality of Beck's detention.

### B. Seizure Question

We review district court's findings of historical fact for clear error and determinations of reasonable suspicion and probable cause *de novo*. *Ornelas v. United States*, 116 S. Ct. 1657, 1663 (1996); *United States v. Juvenile T.K.*, 134 F.3d 899, 902 (8th Cir. 1998); *see United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997); *United States v. Payne*, 119 F.3d 637, 642 (8th Cir.), *cert. denied*, 118 S. Ct. 454 (1997). Beck does not contend that the initial stop of his automobile was in violation of the Constitution, nor could he do so here. We have previously observed "'[i]t is well

6

established that a traffic violation--however minor--creates probable cause to stop the driver of a vehicle.'" *United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)), *cert. denied*, 117 S. Ct. 1014 (1997); *see Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *United States v. Hamby*, 59 F.3d 99, 101 (8th Cir. 1995); *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir.), *cert. denied*, 116 S. Ct. 348 (1995); *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994), *cert. denied*, 514 U.S. 1076 (1995); *Bloomfield*, 40 F.3d at 915; *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). In this case, Officer Taylor's observation of Beck following a motor vehicle too closely provided probable cause for Officer Taylor to stop Beck's automobile. Thus, there is no dispute that the initial stop of Beck's automobile was lawful in this case. Rather, Beck's first point of attack is his claim that the length of the traffic stop was excessive, constituting an illegal detention, prior to the initiation of the drug dog sniff.

This court has held that

> "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. . . .an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."

*United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)); *Bloomfield*, 40 F.3d at 916 (quoting *Willis*, 967 F.2d at 1224). As a result, in determining whether a detention following a lawful stop of a vehicle is reasonable, we have held that a court must consider both the length of the detention and law enforcement officers' efforts to conduct their investigation in a quick

7

and unintrusive manner.  *See Bloomfield*, 40 F.3d at 916-17 (citing cases involving length of detention questions); *see also United States v. Sharpe*, 470 U.S. 675, 686-88 (1985) (detention of twenty minutes following stop was reasonable when the police acted diligently and defendant contributed to the delay); *United States v. Place*, 462 U.S. 696, 709-10 (1983) (detention of ninety minutes was unreasonable when agents did not act diligently to minimize the delay).

During an investigative stop, officers may check for weapons and may take any additional steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see also United States v. Dawdy*, 46 F.3d 1427, 1430 (8th Cir.) (holding that requests for identification of all occupants, explanation of presence in area, and warrant check was within reasonable scope of detention), *cert. denied*, 116 S. Ct. 195 (1995);  *United States v. White*, 42 F.3d 457, 459 (8th Cir. 1994) (holding that request for license, destination, and purpose of trip within reasonable scope of detention); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) (concluding that license and vehicle registration checks were reasonable), *cert. denied*, 514 U.S. 1134 (1995).  Here, although Officer Taylor conducted both a check on Beck's driver's license as well as a criminal history check for Beck, we conclude that there was no unreasonable detention prior to Officer Taylor's issuance of an oral warning to Beck.  After running his background checks, Officer Taylor promptly returned Beck's license and rental agreement, and informed Beck that he was free to leave.  We conclude from this that Officer Taylor employed the least intrusive means of detention reasonably necessary to conclude his investigation during the traffic stop.  *See United States v. Carrazco*, 91 F.3d 65, 66 (8th Cir. 1996) (holding that the police may detain a motorist for a reasonable time in order to check motorist's driver's license); *United States v. White*,

81 F.3d 775, 778 (8th Cir.) (holding that during traffic stop police may run computer check to ascertain whether vehicle was stolen and to ascertain whether there are outstanding arrest warrants for vehicle's occupants), *cert. denied*, 117 S. Ct. 518 (1996). Nonetheless, unless Officer Taylor had a reasonably articulable suspicion for believing that criminal activity was afoot, continued detention of Beck became unreasonable after he had finished processing Beck's traffic violation. *See United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."). Defendant Beck contends that Officer Taylor violated his Fourth Amendment rights by continuing to detain him after Officer Taylor had concluded his investigation for the observed traffic violation. Appellee United States, in turn, characterizes the encounter between Beck and Officer Taylor which followed Officer Taylor's issuance of a verbal warning to Beck as being consensual and therefore not implicating the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). It is axiomatic that not all personal contacts between law enforcement officers and citizens constitute seizures which implicate the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *White*, 81 F.3d at 779. There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case. *United States v. Hathcock*, 103 F.3d 715, 718 (8th Cir. 1997), *cert. denied*, 117 S. Ct. 2528 (1997); *United States v. McKines*, 933 F.2d 1412, 1419 (8th Cir.) (*en banc*), *cert. denied*, 502 U.S. 985 (1991). As this court has indicated previously, "[a] seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to

9

search an area--even if the officer has no reason to suspect the individual is involved in criminal activity--provided the officer does not indicate that compliance with his request is required." *White*, 81 F.3d at 779. Instead, the transformation of a consensual encounter into a *Terry* stop occurs only "when the questioning is so 'intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave.'" *Hathcock*, 103 F.3d at 718 (quoting *McKines*, 933 F.2d at 1419). This court has instructed that circumstances indicative of a seizure include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *United States v. Angell*, 11 F.3d 806, 809 (8th Cir. 1993) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)), *cert. denied*, 512 U.S. 1239 (1994); *Hathcock*, 103 F.3d at 718; *White*, 81 F.3d at 779.

Under the facts of this case, upon Officer Taylor telling Beck that he was free to go, we hold that the encounter between Officer Taylor and Beck was initially consensual. Consensual encounters, of course, do not implicate the Fourth Amendment. *Michigan v. Chesternut*, 486 U.S. 567, 574-76 (1988). At that juncture, Officer Taylor had already returned Beck's driver's license and the rental agreement. Thus, we conclude that Beck was no longer seized at the time Officer Taylor asked for permission to search Beck's automobile because Beck had everything in his possession which he needed to continue his trip. *See White*, 81 F.3d at 779 (concluding that motorist was no longer seized within the meaning of the Fourth Amendment after police had returned motorist's license, vehicle registration, and had issued warning ticket).

The consensual nature of the encounter between Officer Taylor and Beck continued until Beck asked what would happen if he refused to permit a search of his

10

automobile.  At that point Officer Taylor informed Beck that if he refused to consent to a search, Officer Beck would have a canine unit conduct a drug sniff of his automobile.  Because a consensual encounter can become an investigatory detention as a result of police conduct, *see, e.g., United States v. Place*, 462 U.S. 696, 707 (1983) (holding that a seizure occurred when defendant refused to consent to search of his luggage and agents said they were going to take it to a judge to get a search warrant), we do not believe a person in Beck's situation, who had been present when a canine unit had been summoned to the scene and was then told by Officer Taylor that he was going to have a canine unit conduct a drug sniff of Beck's car, would reasonably have felt free to leave.  *See United States v. Finke*, 85 F.3d 1275, 1281 (7th Cir. 1996) (holding that defendant would not have felt free to leave scene of traffic stop when told by officer that a canine unit was being called).

Furthermore, any doubts that Beck had that he was free to drive away were extinguished when, after refusing consent to a search of his automobile, Officer Taylor ordered Beck to get out of his automobile and to stand on the side of the road.  At that point, having been ordered out of his vehicle in order to permit a drug dog sniff, a reasonable person in Beck's situation would not have felt free to leave.

### C.  Reasonable Suspicion

We appreciate that the district court was troubled by the issue of whether Officer Taylor had reasonable suspicion to detain Beck after informing him that he was free to go.  While our disagreement with the district court is outcome determinative here -- we note the district court "barely" found reasonable suspicion to exist here.

Because the purposes of Officer Taylor's initial traffic stop of Beck had been completed by this point, Officer Taylor could not subsequently detain Beck unless

11

events that transpired during the traffic stop gave rise to reasonable suspicion to justify Officer Taylor's renewed detention of Beck. *See Mesa*, 62 F.3d at 162. Thus, we must consider whether Officer Taylor had a reasonable, articulable suspicion that Beck's Buick was carrying contraband or that other criminal activity may have been afoot. *Terry*, 392 U.S. at 30; *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir. 1995), *cert. denied*, 516 U.S. 1139 (1996); *Ramos*, 42 F.3d at 1163; *White*, 42 F.3d at 460. "'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.'" *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994) (quoting *Garcia*, 23 F.3d at 1334); *see also United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (holding that reasonable suspicion is determined in the totality of the circumstances); *Bloomfield*, 40 F.3d at 918 (holding that reasonable suspicion is determined in light of the totality of the circumstances).

This court has summarized the standards used to consider whether reasonable suspicion exists as follows:

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir. 1983); *see also Terry*, 392 U.S. at 20-21, 88 S. Ct. at 1879-80. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances--the whole picture--must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed.2d

12

621 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id*.; however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." *Reid v. Georgia*, 448 U.S. [438] at 440- 41, 100 S. Ct. [2752] at 2754 [65 L. Ed. 2d 890]; *United States v. Sokolow*, 831 F.2d 1413 (9th Cir. 1987), [rev'd on other grounds, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)].

*United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988); *see also United States v. Green*, 52 F.3d 194, 198 (8th Cir. 1995); *Dawdy*, 46 F.3d at 1427; *Bloomfield*, 40 F.3d 910, 919 & n.10. In *United States v. Sokolow*, 490 U.S. 1 (1989), the Supreme Court observed that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *Sokolow*, 490 U.S. at 10; *see United States v. Hoosman*, 62 F.3d 1080, 1081 (8th Cir. 1995); *Bloomfield*, 40 F.3d at 918; *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir.), *cert. denied*, 506 U.S. 1040 (1992).

Here, the government contends that reasonable suspicion for Beck's renewed detention arose from the following seven circumstances: (1) Beck was driving a rental car which had been rented by an absent third party; (2) the Buick was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) Beck's nervous demeanor; (6) Beck's trip from a drug source state to a drug demand state; and (7)

13

Officer Taylor's disbelief of Beck's explanation for the trip. While we are mindful that "conduct which would be wholly innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection," *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983) (internal quotation omitted), "it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) (quoting *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir. 1995)). We hold that the totality of these circumstances fails to generate reasonable suspicion to warrant Beck's renewed detention.

We need not tarry long with the government's first factor. We hold that there was nothing inherently suspicious in Beck's use of a rental vehicle, even though rented by a third person, to travel. *See Wood*, 106 F.3d at 947 (finding that the defendant's use of a rental car was not inherently suspicious). Beck told Officer Taylor that his wife had rented the Buick for him. The rental agreement checked out. Indeed, Officer Taylor testified at the suppression hearing that he had no reason to suspect that Beck's explanation was untrue. Tr. at 26.

We combine for analysis the government's second and sixth reasons since both focus on the fact that the Buick was coming from California, a purported "source state" for drugs. Officer Taylor testified that he thought it important that Beck was traveling from a drug source state and traveling to a drug demand state. Tr. at 22. The criteria employed by Officer Taylor to impart that title on a particular state was unexplained. Indeed, Officer Taylor testified that he considered not only California to be a drug source state, but also Arizona, Texas, New Mexico, Florida, and Louisiana. Tr. at 22.

This court has previously held that out-of-state plates are consistent with

14

innocent behavior and not probative of reasonable suspicion. *See Ramos*, 42 F.3d at 1163. While we do not suggest that geography is an entirely irrelevant factor, *see Sokolow*, 490 U.S. at 3 (finding that the geography was relevant where defendant was traveling to and from Miami since Miami was "a source city for illicit drugs."), we do not think that the entire state of California, the most populous state in the union, can properly be deemed a source of illegal narcotics such that mere residency in that state constitutes a factor supporting reasonable suspicion. *See Karnes*, 62 F.3d at 495 (holding that mere fact that driver of automobile was from Florida and automobile was registered in Florida would not constitute a factor supporting reasonable suspicion). Because millions of law-abiding Americans reside in California and travel, mere residency in and travel from the State of California means the officer's "source state" factor must be considered in this context.[2] Innumerable other Americans travel to that state or through there for pleasure or lawful business. Clearly, the vast number of individuals coming from that state must relegate this factor to a relatively insignificant role. Indeed, Officer Taylor conceded at the suppression hearing that interstate motorists have a better than equal chance of traveling from a source state to a demand state. Tr. at 23. We conclude, in the circumstances of this case, that no specific, articulable basis warranting a reasonable belief that Beck's Buick contained contraband can be gleaned from the mere fact that Beck's Buick was registered and licensed in California. Here, this circumstance is an extremely weak factor, at best, to suspect

---

[2]According to the United States Bureau of the Census, as of July 1, 1997, with a population of 32,268,000, almost one in every eight Americans is a resident of California. When the populations of the other "source states" identified by Officer Taylor are considered, the number rises to 76,998,000, or more than one-fourth the United States' population of 267,636,000. *See* United States Bureau of the Census, http://www.census.gov/statab/ranks/pr01.txt.

criminal activity.[3]  *See Karnes*, 62 F.3d

---

[3]A review of case law reveals that law enforcement officers have not only purported to identify a number of supply states, but also a significant number of the largest cities in the United States as "drug source cities." *See Reid v. Georgia*, 448 U.S. 438, 440 (1980) (agent identified Fort Lauderdale as drug source city); *United States v. Scarborough*, 128 F.3d 1373, 1378 (10th Cir. 1997) (Colorado deemed to be a "narcotics source state"); *United States v. Dennis*, 115 F.3d 524, 538 n.4 (7th Cir. 1997) (postal inspector identified as drug source states "the entire West Coast" as well as Texas, Florida, Arizona, and parts of Washington); *United States v. Jerez*, 108 F.3d 684, 686 (7th Cir. 1997) (law enforcement officer identified Texas, Florida, Arizona and California as drug source states); *United States v. Polk*, 97 F.3d 1096, 1097 (8th Cir. 1996) (identifying Los Angeles as a source city); *United States v. Underwood*, 97 F.3d 1453, 1996 WL 536796, *3 (6th Cir. Sept. 11, 1996) (noting in unpublished table decision that Long Beach was a drug source city), *cert. denied*, 117 S. Ct. 787 (1997); *United States v. Burgos*, 94 F.3d 849, 868 (4th Cir. 1996) (acknowledging that New York City is a source city for contraband drugs), *cert. denied*, 117 S. Ct. 1087 (1997); *United States v. Fletcher*, 91 F.3d 48, 50 (8th Cir. 1996) (identifying Phoenix as drug source city), *cert. denied*, 117 S. Ct. 1258 (1997); *United States v. McNeil*, 4 F.3d 987, 1993 WL 347524, *1 (4th Cir. Sept. 7, 1993) (recognizing New Jersey as drug source state in an unpublished table decision), *cert. denied*, 510 U.S. 1135 (1994); *United States v. Odum*, 72 F.3d 1279, 1282 (7th Cir. 1995) (identifying Houston as source city); *United States v. Johnson*, 64 F.3d 1120, 1125 (8th Cir. 1995) (noting that Chicago was a source city), *cert. denied*, 516 U.S. 1139 (1996); *White*, 42 F.3d at 460 (identifying El Paso and Albuquerque as drug source cities); *United States v. McMurray*, 34 F.3d 1405, 1409 (8th Cir. 1994) (characterizing Oakland, California, and Portland, Oregon as drug source cities), *cert. denied*, 513 U.S. 1179 (1995); *United States v. O'Neal*, 17 F.3d 239, 241 n.3 (8th Cir. 1994) (pointing out that Miami is deemed to be drug source city), *cert. denied*, 513 U.S. 960 (1994); *United States v. Respress*, 9 F.3d 483, 487 (6th Cir. 1993) (recognizing Ontario, California, as drug source city); *United States v. Fifty-Three Thousand Eighty-Two Dollars In U.S. Currency, $53,082.00*, 985 F.2d 245, 247 (6th Cir. 1993) (characterizing Dallas as a drug source city); *United States v. Jennings*, 985 F.2d 562, 1993 WL 5927, *1 (6th Cir. Jan. 13, 1993) (denoting in unpublished table decision that Newark is a drug source city); *United States v. Ushery*, 968 F.2d 575, 579 (6th Cir.) (identifying San Francisco as a drug source city), *cert. denied*, 506 U.S. 946 (1992); *United States v. Galvan*, 953 F.2d 1098, 1102 (8th Cir. 1992) (labeling San Diego as a drug source city); *United States v. Flowers*, 912 F.2d 707, 708 (4th Cir. 1990) (identifying Detroit as a drug

(continued...)

16

at 495 (holding that because Florida was not the only "known drug center," the fact that defendant was from Florida could not be a factor supporting reasonable suspicion); *United States v. Dennis*, 115 F.3d 524, 538 n.4 (7th Cir. 1997) (discounting the probative value of the fact that a package was mailed from California); *see also Reid*, 448 U.S. at 440 (holding that suspect's arrival at the Atlanta airport from a "drug source" city was inadequate to support a finding of reasonable suspicion).

We also conclude that the mere presence of fast-food wrappers in the Buick is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity. *See Wood*, 106 F.3d at 947 (holding that the suspicion associated with the possession of fast- food trash "is virtually nonexistent"); *Karnes*, 62 F.3d at 496 (noting that fast-food wrappers "have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler."). The district court judge, himself, admitted to having fast-food trash in his truck during trips. Officer Taylor offered no basis for his supposition, that the existence of fast-food trash constitutes an identifier of drug trafficking activity, from which any reviewing authority can gauge the reasonableness of his assumption. He merely recounted that he has seen fast-food trash on "several occasions" during traffic stops of drug traffickers.

The government also points to the fact that Officer Taylor observed no luggage in the passenger compartment of the Buick. Because it is eminently reasonable to store luggage in the trunk of an automobile when traveling, we think that this circumstance

---

3(...continued)
source city), *cert. denied*, 501 U.S. 1253 (1991).

fails to generate any suspicion of criminal activity.  Indeed, motorists are specifically advised by law enforcement agencies, as a crime prevention tip, not to leave their luggage in view.[4]

Yet, another factor put forward by the government justifying Beck's renewed detention was Officer Taylor's subjective assessment that Beck was nervous during the traffic stop.  It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.  *See Wood*, 106 F.3d at 947 ("It is certainly not uncommon for most citizens--whether innocent or guilty--to exhibit signs of nervousness when confronted by a law enforcement officer.").  Officer Taylor himself testified that in approximately twenty-five percent of the traffic stops he conducts the detained motorist is at least as nervous as Beck was here.  Tr. at 29.  Furthermore, Officer Taylor had never previously met Beck and therefore had no measure by which to gauge Beck's behavior during the traffic stop with his usual demeanor.  We conclude that any suspicion associated with Beck's nervous demeanor during the traffic stop to be, at best, minimal.  *See United States v. Barron-Cabrera*, 119 F.3d 1454, 1461 (10th Cir. 1997) (holding that "'[w]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials. . . .'") (quoting *United States v. Peters*, 10

---

[4] A casual search on the Internet reveals numerous police department web cites which warn motorists to keep their valuables out of sight and locked in the trunk. *See* CRIME PREVENTION TIPS, TIPS ON STAYING SAFE IN YOUR CAR, http://www.our-town.com/spd/prevent1-29-97.htm; CRIME PREVENTION VACATION SECURITY, http://www.aegisinc.com/aegisinc/cp/cp08-01.htm; BUSINESS TRAVEL, SAFETY TIPS, http://www.city.palo-alto.caus/palo/city/police/vacation.htm; VACATION SAFETY TIPS, http://www.absuci.edu/depts/police/safetytips/vacation.htm.

F.3d 1517, 1521 (10th Cir. 1993) (in turn quoting *United States v. Hall*, 978 F.2d 616, 621 n.4 (10th Cir. 1992)); *Wood*, 106 F.3d at 948 (that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . must be treated with caution.'") (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994).

Lastly, the government directs us to Officer Taylor's subjective disbelief of Beck's reason for his travels. Officer Taylor did not believe that a truck driver would travel across the United States to procure employment given the number of employment opportunities for truck drivers that lay in between California and North Carolina. Although unusual or suspicious travel plans may give rise to reasonable suspicion, *see Wood*, 106 F.3d at 946-47 (noting that "unusual travel plans may provide an indicia of reasonable suspicion."); *United States v. Kopp*, 45 F.3d 1450, 1453 (10th Cir.) (finding that suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion), *cert. denied*, 514 U.S. 1076 (1995), we see nothing suspicious about Beck's explanation for interstate travel in order to seek employment. Untold numbers of Americans move for employment reasons every year, many moving across the United States to take advantage of employment opportunities. We are unwilling to suggest that a job search in a distant location is inherently suspicious merely because similar employment opportunities exist in closer proximity to one's residence.

Finally, we conclude that the constitutionality of Beck's renewed detention and resulting search cannot be saved by the government's incantation that: "'[A] series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together.'" *Bloomfield*, 40 F.3d at 918 (quoting *Weaver*, 966 F.2d at

394). Given the unique circumstances of this case, we conclude that the seven factors, whether viewed individually or in combination, do not generate reasonable suspicion for Beck's renewed detention.

### III. CONCLUSION

Accordingly, because Officer Taylor's renewed detention of Beck and the Buick was without reasonable suspicion, the evidence of drug trafficking obtained during Beck's renewed detention was tainted by the unlawfulness of that detention and should have been suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963); *Ramos*, 20 F.3d at 352; *United States v. Jefferson*, 906 F.2d 346, 348 (8th Cir. 1990); *see also United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983). Since Officer Taylor illegally seized the Buick on the highway, there is no question that the drug evidence subsequently found during the purported inventory search of the Buick constitutes the fruit of an unlawful seizure and must also be suppressed. We reverse the district court's denial of the motion to suppress, which, in turn, requires that we reverse defendant Beck's conviction and remand for further proceedings, if so advised.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH

20