# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3517

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeals from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| Courtney Allen Coney, | * | |
| | * | |
| Appellant. | * | |

_____

No. 05-3590

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Robert Allen Coney, | * |
| | * |
| Appellant. | * |

_____

No. 05-3931
_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
      v.                                     *
                                             *
Marco Allen Coney,                           *
                                             *
            Appellant.                       *

_____

Submitted:  April 19, 2006
    Filed:  August 4, 2006
_____

Before LOKEN, Chief Judge, BOWMAN and BYE, Circuit Judges.
_____

BOWMAN, Circuit Judge.

Brothers Courtney Allen Coney, Robert Allen Coney, and Marco Allen Coney[1] (collectively, the defendants) appeal the denial by the District Court[2] of their motions to suppress.  We affirm.

_____

[1]Because the defendants share the same middle and last names, we will refer to each defendant by his first name, i.e., Courtney, Robert, and Marco.

[2]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, adopting the Report and Recommendation of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

## I.

On a cold but sunny day in December 2004, Deputy Bill Maddux of the Seward County (Nebraska) Sheriff's Office was running stationary radar on Interstate 80. In the early afternoon, Maddux clocked a van occupied by the defendants traveling eighty-one miles per hour. Because the maximum speed limit was seventy-five miles per hour, Maddux made a traffic stop of the van. Robert was in the driver's seat, Marco was in the front passenger's seat, and Courtney was in the far back of the van on the rear-bench seat. After Maddux informed Robert that he had been speeding, Maddux asked Robert to come to the patrol car. Robert obliged. While inside the patrol car, Maddux told Robert that he was going to receive a warning for speeding. Maddux checked the status of Robert's driver's license, checked to see if any outstanding warrants for Robert existed, and because the van was rented, reviewed the van's rental agreement. The rental agreement listed the defendants' mother as the renter and Courtney as the additional driver. While performing these duties, Maddux asked Robert about his travel plans, e.g., where the brothers had been and where they were going. Maddux then asked Robert to stay in the car so that Maddux could go to the van to ask Courtney and Marco some questions about the rented van, since the renter was not present. Maddux asked Marco about the rental agreement and also asked Marco and Courtney about their travel plans, including where they had been and where they were going. Maddux then told Marco that he was going to write a warning to Robert for speeding and that they would be finished shortly.

When Maddux returned to the patrol car, he finished writing the warning to Robert, again asked Robert where he had been, and received communications from dispatch that Robert's license was valid and that no warrants were outstanding. Maddux returned Robert's license and rental agreement, issued a written warning, and told Robert "that he was free to go." Suppression Hearing Transcript at 44:6–7. After Robert had exited the patrol car but before he shut the door, Maddux asked Robert if he would mind talking for a minute. Robert agreed to do so. Because it was cold

outside, Maddux asked Robert if he would mind sitting in the patrol car. Robert agreed and returned to the front seat. Maddux then asked Robert if he would mind staying in the patrol car while Maddux returned to the van to talk to Courtney and Marco. Robert agreed to remain in the patrol car and never indicated that he did not want to remain there. At this point, approximately fifteen minutes had elapsed since Maddux had clocked the van traveling over the speed limit.

Returning to the van, Maddux asked Marco if he would talk to Maddux for a few minutes. When Marco agreed, Maddux asked if Marco would mind stepping out of the van to talk. Marco exited the van. While standing in front of the van, the two men talked about the brothers' trip. Maddux asked Marco if he had any luggage, illegal drugs, or a weapon in the van. After Marco said that he had a few bags but did not have drugs or weapons, Maddux asked Marco for permission to search his bags. Marco said, "[Y]eah, that's fine." Id. at 48:8. Marco then asked Maddux why he was asking these questions. Maddux said that a few things were not adding up and that he wanted to make sure that Marco did not have any of the items discussed. For officer safety reasons, Maddux asked Marco to stand in the ditch in front of the van.

Maddux returned to the van to seek Courtney's consent to search the van since Courtney was listed on the rental agreement. Maddux asked Courtney if he would mind talking for a few minutes. Courtney agreed. Maddux asked Courtney about the trip and if he had any bags, drugs, or weapons. Courtney said that he had bags but no drugs or weapons. When Maddux asked Courtney for permission to search his bags and the van, Courtney said no. Maddux returned to the patrol car and asked Robert if he had bags or drugs in the van. Robert said that he had a bag or two but no drugs. Maddux asked Robert for permission to search his bags. Robert refused. Maddux then asked Robert "if he would mind having a seat in the back seat of [Maddux's] patrol unit, which is a caged area where we haul prisoners." Id. at 51:14–16. Robert agreed and sat in the back seat. Maddux wanted Robert to sit in

the back seat because he planned to bring Marco to the patrol car and because Maddux had developed "a major safety concern at that time." Id. at 52:6.

Maddux motioned for Marco to come over to the patrol car. When Marco arrived, he and Maddux spoke while standing at the rear of the car. Maddux thanked Marco for his cooperation and explained that Robert and Courtney had refused to allow a search of their bags or the van. Marco responded that he did not understand why his brothers would not allow Maddux to search and told Maddux that Marco wanted to talk to his brothers. Maddux informed Marco that he was going to call a drug-detection dog "to do a sniff around the" van. Id. at 53:18–19. Marco again asked to talk to Courtney, and Maddux said okay. Marco and Maddux then went to the van where Marco asked Courtney, "[W]hy don't you want them to search the van or search the bags, we ain't got anything." Id. at 54:18–19. After a brief discussion between Marco and Courtney about granting Maddux permission to search, Courtney said, "[Y]eah, yeah." Id. at 56:4. At that point, Maddux asked Courtney to step out of the van. Maddux "confirmed with [Courtney] three more times that it was okay for [Maddux] to search the vehicle." Id. at 56:23–24. Maddux then asked Courtney to stand on the shoulder of the interstate and asked Marco to sit in the front seat of the patrol car. Maddux told Marco that Maddux would wait for a state trooper to arrive before conducting the search. Three to four minutes later, a state trooper arrived on the scene.

Maddux talked to the state trooper while standing between the van and Maddux's patrol car. Marco then exited the patrol car and said that he would open the van's rear door so that Maddux could search. Maddux told Marco to return to the patrol car and that if he needed anything, he should get Maddux's attention without leaving the car. Marco returned to the car. About a minute later, Marco again got out of the patrol car and asked if he could open the van's rear door. Maddux asked Marco to return to the car, which Marco did. About another minute later, a third state trooper arrived, at which time Maddux began searching the van. Maddux discovered

shoe boxes containing four packages of cocaine and three packages of marijuana. Maddux also "found a loaded and chambered semi-automatic [45-caliber] handgun" behind the back seat, accessible only through the rear cargo hatch of the van. Id. at 69:14–15.

Courtney, Robert, and Marco were charged with conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1), 846 (2000), and with possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1). Additionally, Marco was charged with possession of a firearm in furtherance of the crimes contained in the other charges, in violation of 18 U.S.C. § 924(c)(1)(A). Each defendant filed a motion to suppress the evidence gained from the search of the van.

The Magistrate Judge held a suppression hearing, at which Maddux, Courtney, Robert, and the defendants' mother testified. At the conclusion of the hearing, the Magistrate Judge ruled from the bench that the motions to suppress should be denied. First, the Magistrate Judge determined that Maddux had probable cause to stop the van for speeding. Second, the Magistrate Judge determined that at the time Maddux gave Robert the warning, returned Robert's license and the rental agreement, and told Robert that he was free to go, Maddux did not have reasonable suspicion to further detain Robert. The Magistrate Judge stated, however, that "the officer got lucky." Suppression Hearing Transcript at 326:17. The Magistrate Judge concluded that when Maddux "asked Robert if he would get back into the [patrol] car and answer some questions [and] Robert agreed and did so[, . . .] at that point [it was] a consensual encounter between citizen and officer." Id. at 326:17–24. Third, the Magistrate Judge addressed the question of whether Maddux had obtained consent to search the van. Stating that "it's a very close question," the Magistrate Judge "side[d] with the officer on the credibility of the consent issue." Id. at 328:9–11. The Magistrate Judge concluded, "I think that Courtney did give consent. And I think that there's nothing to indicate that that consent was other than completely voluntary. If

there was pressure, it was by Marco and not by the officer." Id. at 328:12–15. The Magistrate Judge later filed a short Report and Recommendation (R&R) recommending that the District Court deny the defendants' motions to suppress.

The defendants objected to the R&R. The District Court adopted the R&R and denied the defendants' motions to suppress. Thereafter, Courtney, Robert, and Marco each entered a conditional guilty plea to the conspiracy count, reserving the right to appeal the denial of their motions to suppress. They now exercise those rights.

We review the District Court's legal conclusions de novo and its factual findings for clear error. United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003). We review for clear error the District Court's finding that Courtney voluntarily consented to the search of the van. Id. "We will affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Vanhorn, 296 F.3d 713, 717 (8th Cir. 2002), cert. denied, 537 U.S. 1167 (2003).

II.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; see United States v. Ameling, 328 F.3d 443, 447 (8th Cir.) (recognizing that the Fourth Amendment applies to the states through the Fourteenth Amendment), cert. denied, 540 U.S. 961 (2003). The Supreme Court has stated that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). This case presents three issues involving consideration of the Fourth Amendment. First, did the District Court err in deciding that Maddux had

probable cause to stop the van for speeding? Second, did the District Court err in concluding that after Maddux concluded the traffic stop, a consensual encounter ensued between a police officer and three citizens? Third, did the District Court err in finding that Courtney voluntarily consented to a search of the van?

A.

The defendants argue[3] that Maddux lacked probable cause to stop the van. First, they contend that the stop was pretextual, arguing that Maddux stopped the van because the Coneys are black. Second, they maintain that the District Court's factual finding that Maddux clocked the van traveling eighty-one miles per hour was clearly erroneous because the van was traveling seventy-five miles per hour. Finally, they maintain that the Magistrate Judge violated Neb. Rev. Stat. § 60-6,192 (2004) and State v. Lomack, 476 N.W.2d 237 (Neb. 1991), by allowing Maddux to testify that the radar clocked the van traveling eighty-one miles per hour.

An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. Brown, 345 F.3d at 578. "This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002); see Whren v. United States, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis"). As long as an officer "objectively has a reasonable basis for believing that the driver has breached a traffic law," the officer has probable cause to conduct a traffic stop. United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996).

---

[3]When referring to the defendants' arguments, we actually may be addressing an argument made by one, two, or all three of the defendants.

Robert argues that "Maddux's initial stop [of the van] was not the result of an observed law violation, but was the result of a racially based stop." Robert's Brief at 7. This argument relates to the defendants' argument that Robert was not speeding. The defendants presented evidence—through the testimony of Robert, Courtney, and the defendants' mother—that the van's cruise control was set on seventy-five miles per hour and therefore was not speeding. In essence, the defendants' evidence attempted to cast doubt on Maddux's testimony that he clocked the van going eighty-one miles per hour. The District Court clearly rejected the defendants' evidence in favor of Maddux's testimony, thereby believing Maddux that he had observed a traffic violation. After thoroughly reviewing the record, we see no clear error in the findings that Maddux stopped the van for speeding and not because of the defendants' race. Because the van's speeding gave Maddux probable cause to stop the van, the defendants' pretext argument that Maddux stopped them because of their race cannot prevail.[4] That is not the end of our inquiry, however.

We now address—and reject—the argument that the District Court erroneously concluded that Maddux had probable cause to stop the van for speeding because the government failed to establish the proper foundation under Neb. Rev. Stat. § 60-6,192 to admit Maddux's testimony that the radar clocked the van traveling eighty-one miles per hour. The Magistrate Judge acknowledged that the defendants had made "a nice argument," but rejected it because he believed "that that's a guilt beyond a reasonable doubt standard and not a probable cause standard." Suppression Hearing Transcript at 322:9–13. Finding that Maddux was running radar when he saw the van traveling eighty-one miles per hour, that Maddux had "that morning tested the machine," and that Maddux had "been certified in the use of this very machine in the past," id. at 322:17–20, the Magistrate Judge concluded, "I don't have any problem with

---

[4]For the sake of completeness, we note that the issue of "selective enforcement of the law based on considerations such as race" is based on "the Equal Protection Clause, not the Fourth Amendment." Whren, 517 U.S. at 813. We also note that the defendants have not asserted an equal-protection claim.

concluding that a reasonable officer in his position would have found that there was probable cause to stop this vehicle," id. at 322:21–24.

The defendants specifically contend that Nebraska law prohibits the use of radar evidence in suppression hearings when the government fails to strictly follow § 60-6,192(1). We do not read Nebraska law that broadly. In Lomack, the Nebraska Supreme Court expressly stated, "We note that [§ 60-6,192(1)] requires a rather uncomplicated procedure to meet the statutory foundation for admission of radar evidence in a contested speeding case." 476 N.W.2d at 242 (emphasis added); cf. State v. Hill, 577 N.W.2d 259, 263–64 (Neb. 1998) (stating that "where evidence of speed is adduced not to establish a driver's rate of travel so as to prove a charge that he exceeded a particular speed limit, but, rather, as one piece of evidence tending to establish that the driver operated a vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property, the speed is not 'at issue,' as contemplated by [§ 60-6,192], and therefore need not be corroborated by a microwave, mechanical, or electronic speed measurement device"). Thus, the defendants' attack on the government's evidence based on Lomack and § 60-6,192(1) is better left to speeding cases and not to motions to suppress evidence in federal drug cases. Whether the State of Nebraska would have been able to prosecute Robert for speeding is another question, but one that we do not need to address here.

It is critical to understand that "[t]he determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999). We completely agree with the District Court that Maddux had probable cause to stop the defendants' van because he objectively had a reasonable basis for believing that the van was speeding. There is no indication from the record that Maddux had any idea that his radar was not functioning properly. Instead, the exact opposite is true. Maddux's multiple tests of the radar indicated that it was functioning properly. When the radar indicated that the van was speeding, Maddux

had probable cause to make a traffic stop. The bottom line is the District Court found that Maddux believed the radar was functioning properly, that the radar clocked the van traveling eighty-one miles per hour, and that Maddux stopped the van for speeding and not because of the defendants' race. Because these findings are not clearly erroneous, we hold that Maddux's stop of the van was supported by probable cause.

## B.

The defendants next argue that their constitutional rights were violated because Maddux unlawfully detained them without reasonable suspicion of criminal activity. The defendants maintain that Maddux unlawfully expanded the scope of the traffic stop by asking Marco and Courtney questions instead of simply writing Robert a warning for speeding. We disagree. Once Maddux made the traffic stop, he had the authority to check Robert's license and the van's registration, ask Robert about his destination and purpose, and request that Robert sit inside the patrol car. Brown, 345 F.3d at 578. Maddux also had the authority to ask Marco and Courtney, the passengers, similar questions to verify the information that Robert had provided. Id. That's exactly what happened here. While talking to Robert about his trip, Maddux discovered that the van was a rental, that the renter was not present, and that the additional driver on the rental agreement was not Robert but was Courtney. Once Maddux heard Robert's answers about the trip, Maddux had the authority to ask the passengers of the van similar questions. He also had the authority to talk to the listed driver. Therefore, Maddux's questioning of Marco and Courtney before Maddux ended the traffic stop for speeding was not an unlawful detention.

The defendants next contend that once Maddux told Robert that he was free to go, everything that happened after that point was an unlawful detention. The District Court rejected this argument and found that when Robert agreed to return to the patrol car, Robert was not detained because at that point it was a consensual encounter.

-11-

The Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434 (1991). Indeed, Supreme Court "cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' California v. Hodari D., 499 U.S. 621, 628 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Id.; see also Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The Court has explained "that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 434–35 (internal citations omitted).

We conclude that the District Court had the factual and legal support to hold that after the traffic stop ended, Maddux's questioning did not constitute a detention but was merely a consensual encounter between a single officer and three citizens. Maddux did not use physical force, make a show of authority, or use demanding language, but simply asked the defendants whether they had unlawful items and whether they would consent to a search of their bags or the van. As proof that the defendants could disregard Maddux's questions, both Courtney and Robert exercised their rights to deny Maddux's requests to search their bags or the van. The defendants point to Maddux's placing Robert in the back seat of the patrol car as evidence that Robert was seized. In context, this argument fails. It was a cold day and Maddux wanted to talk to both Marco and Robert while sitting inside the patrol car, which could only be accomplished by asking someone to sit in the back seat. And Maddux

-12-

did not order Robert to sit in the back seat, but asked him if he would mind sitting in the back seat. Robert complied. We conclude that the District Court was not required to determine that this incident ended the consensual encounter.

The defendants next argue that the consensual nature of the encounter ended when Maddux told the defendants that he was bringing a drug-detection dog to perform a sniff of the van. We reject this argument for two reasons. First, the defendants rely on Robert's and Courtney's testimony, completely disregarding Maddux's testimony. According to Maddux, he only informed Marco that Maddux was going to bring a drug-detection dog to sniff around the vehicle. This statement was made only after Marco had already consented to a search of his bags and while the two men were standing behind Maddux's patrol car. Maddux never informed Courtney that Maddux was going to use a drug-detection dog. Instead, Courtney consented to a search of the van without reference to a drug-detection dog and based on Marco's urging, as will be discussed below when we discuss the consent issue.

Second, the defendants' heavy reliance on United States v. Beck, 140 F.3d 1129 (8th Cir. 1998), does not compel a conclusion that Maddux's statement to Marco about the drug-detection dog turned the consensual encounter into an investigative detention. In Beck, we held that a consensual encounter ended when a police officer informed a citizen, Beck, that if Beck would not consent to a search of his vehicle, then the officer would use a drug-detection dog to perform a sniff of the vehicle. Id. at 1135. But see United States v. Alexander, 448 F.3d 1014, 1015–17 (8th Cir. 2006) (holding that a defendant's Fourth Amendment rights were not violated when an officer used a drug-detection dog to sniff around a vehicle after the defendant refused to consent to a search of the vehicle). Our rationale in Beck was that a person who refuses to consent to a search of a vehicle would not reasonably feel free to leave once an officer informed the person that the officer would use a drug-detection dog to perform a sniff of the vehicle. 140 F.3d at 1135–36. We also stated that "any doubts that Beck had that he was free to drive away were extinguished when, after

refusing consent to a search of his automobile, [the officer] ordered Beck to get out of his automobile and to stand on the side of the road" so that the officer could have his drug-detection dog perform a sniff of the vehicle. Id. at 1136.

We readily distinguish Beck because Maddux did not use the "threat" of a drug-detection dog or the delay in bringing a dog to the scene to elicit consent from Marco to search his bags or from Courtney to search the van. Marco had already consented to a search of his bags before Maddux mentioned the use of a drug-detection dog, and Maddux never told Courtney about the use of a drug-detection dog to gain his consent to search the van. Maddux mentioned the use of a drug-detection dog to sniff around the van only after he informed Marco that Robert and Courtney had refused to consent to searches of their bags or the van. Because Marco had already consented to a search of his bags, any delay in searching his bags was brief and Maddux would have had the authority anyway to have a drug-detection dog search the exterior of the van while Maddux searched Marco's bags. See Illinois v. Caballes, 543 U.S. 405, 406–10 (2005) (holding that the Fourth Amendment is not violated when police use a drug-detection dog to sniff around the exterior of a vehicle during a lawful traffic stop lasting less than ten minutes, even when no reasonable, articulable suspicion of drug activity supports the use of the dog); Alexander, 448 F.3d at 1017 (holding that a four-minute detention from the time the defendant refused to consent to a search of his vehicle until the time the police officer used a drug-detection dog to sniff around the vehicle did not violate the defendant's Fourth Amendment rights). Stated another way, the Fourth Amendment would not have been violated had another trooper walked a drug-detection dog around the defendants' van while Maddux searched Marco's bags. We conclude that the District Court did not err in concluding that the encounter between Maddux and the defendants did not lose its consensual nature after the traffic stop had ended.

C.

The defendants also attack the constitutionality of the search of the van by arguing that Courtney did not consent to a search of the van, that Courtney consented only to a search of Marco's bags, that Courtney withdrew his consent once Maddux began searching the van, and that Maddux's search exceeded the scope of Courtney's consent. In making these arguments, the defendants again focus on testimony from the defendants and not from Maddux, even though the District Court clearly favored Maddux's testimony. The defendants' reliance on rejected testimony bears little weight on appeal because the District Court's "determination as to the credibility of a witness is virtually unreviewable on appeal. The assessment of a witness's credibility is the province of the trial court." United States v. Heath, 58 F.3d 1271, 1275 (8th Cir.) (internal citations omitted), cert. denied, 516 U.S. 892 (1995). In reviewing the District Court's finding that Courtney voluntarily consented to a search of the van, we give great weight to the District Court's credibility determinations.

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The District Court essentially was asked whether the government established "that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making." United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir.) (internal citations and quotations omitted), cert. denied, 543 U.S. 1035 (2004). "In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." Id. at 684–85. In essence, the Fourth Amendment requires that an officer reasonably believes that he has received consent to search. Id. at 685. A court, therefore, must determine "whether the totality of the

circumstances demonstrates that the consent was voluntary." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (explaining that courts must look at the characteristics of the defendant and at the details of the environment in considering whether the totality of the circumstances shows voluntary consent).

We have little difficulty concluding that the District Court's finding that Courtney voluntarily consented to a search of the van was not clearly erroneous. Courtney, an adult who was listed as the driver on the rental agreement, initially denied Maddux's request to search the van, showing that Courtney knew that he was not required to consent to a search. We also note that there is no evidence that Courtney was under the influence of drugs or alcohol or that Maddux used intimidation or threats to evoke consent. Instead, the record shows and the District Court found that Marco, without the aid of Maddux, convinced Courtney to consent to a search of the van. After Maddux heard Courtney say that he would consent to a search, Maddux asked Courtney if he really was consenting to a search of the van. Courtney acknowledged three times that he was indeed consenting to a search of the van. When these facts are overlain on the District Court's credibility determinations, we have no choice other than to accept the District Court's finding that Courtney voluntarily consented to a search of the van. That finding is well within the very broad discretion of a district court in assessing credibility. See Heath, 58 F.3d at 1275.

## III.

For the foregoing reasons, we affirm the District Court's denial of the defendants' motions to suppress.

_____

-16-