UNITED STATES of America, Plaintiff,

v.

William KIRKPATRICK, Defendant.

No. 4:97CR3079.

United States District Court,
D. Nebraska.

May 7, 1998.

David R. Stickman, Federal Public Defender's Office, Omaha, NE, John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for William A. Kirkpatrick aka Donald E. Wilson, Defendant.

Alan L. Everett, Asst. U.S. Atty., Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 29) and the objections to the Recommendation (filing 30), filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objections have been made. Since Judge Piester has fully, carefully, and correctly found the facts and applied the law, the Recommendation (filing 29) should be adopted, the government's objections to the Recommendation (filing 30) should be denied, and the defendant's motion to suppress (filing 17) should be granted.

Two points merit a brief discussion. The first relates to Judge Piester's finding and conclusion that the original lawful stop and detention of the defendant turned into an unlawful seizure. The second relates to the government's request for a supplemental evidentiary hearing.

### I.

■ I agree with Magistrate Judge Piester that Trooper Bigsby needed reasonable articulable suspicion for believing that criminal activity was afoot in order to continue to detain defendant Kirkpatrick after Bigsby had finished processing Kirkpatrick's traffic violation. Specifically, at the moment Trooper Bigsby returned Kirkpatrick's license and car rental agreement and finished giving him an oral warning about speeding, Kirkpatrick had everything he needed to lawfully continue his travels, making the encounter between Bigsby and Kirkpatrick at that point consensual and permissible without reasonable suspicion. *United States v. Galvan–Muro,* 141 F.3d 904, 906–07 (8th Cir.1998); *United States v. Beck,* 140 F.3d 1129, 1135–36 (8th Cir.1998).

■] However, the consensual nature of this encounter ceased when Kirkpatrick no longer reasonably felt free to leave, thereby requiring reasonable suspicion to justify further detention. "[A] consensual encounter can become an investigatory detention as a result of police conduct," *Beck,* 140 F.3d at 1135–36, and "[c]ircumstances indicative of a seizure may include '. . . use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Galvan–Muro,* 141 F.3d at 906 (quoting *United States v. White,* 81 F.3d 775, 779 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 518, 136 L.Ed.2d 406 (1996)). The facts show that the trooper completed his business with Kirkpatrick, but then went on to detain the defendant on nothing more than a hunch.

As described by Judge Piester, after Trooper Bigsby returned Kirkpatrick's license and rental agreement to him and gave him a verbal warning about speeding, he asked Kirkpatrick if he had "large amounts of cash," guns, marijuana, or cocaine in his vehicle. Bigsby then repeatedly asked Kirkpatrick if Bigsby could search his vehicle, in response to which Kirkpatrick twice refused and asked if he could "go now." (Ex. 2, Transcript of Nebraska State Patrol Recording of Kirkpatrick's Traffic Stop, at 12.) At that point, Kirkpatrick attempted to exit the vehicle, and Trooper Bigsby told Kirkpatrick to "shut the door" and called loudly, "Don, Don, Don! Don!" (*Id.* at 13.) It was at this point that Kirkpatrick would not reasonably have felt free to leave, thus requiring reasonable suspicion to justify Bigsby's renewed detention of Kirkpatrick. *Beck,* 140 F.3d at 1135–36.

■ As discussed in great detail by Judge Piester, the facts here do not individually or collectively establish reasonable suspicion sufficient to warrant Kirkpatrick's renewed detention. Because this detention lacked reasonable suspicion, the evidence obtained

during the subsequent search of Kirkpatrick's vehicle was fruit of an unlawful seizure and should be suppressed. *Id.* at 1138–39.

Despite Judge Piester's careful analysis, the government continues to argue that the trooper had a "reasonable suspicion" that justified the detention of the defendant. I disagree, and find strong support for Judge Piester's decision in a recent case from the Eighth Circuit Court of Appeals. In *United States v. Beck*, 140 F.3d 1129, 1135–40 (8th Cir.1998), the Court of Appeals found that an unlawful seizure occurred although the initial stop and initial detention related to that stop were lawful. *Beck* and this case are similar, and comparing the two cases is therefore helpful.

### A. *Beck*

In *Beck* the defendant was driving a rented car when an Arkansas police officer stopped him after the officer observed Beck's green Buick with California license plates following another vehicle too closely. After checking, the police officer found that Beck had a valid driver's licence and no criminal history. After those checks, the officer returned to Beck's vehicle and handed back Beck's driver's license and rental agreement. The officer then gave Beck a verbal warning and told him that he was free to go.

Despite the officer's statement that Beck was free to go, the officer asked Beck if he had guns, drugs, or knives in the car. Beck responded negatively while staring out the window. The officer then asked if he could search the car. Beck became more nervous and asked why. Beck told the officer that he was trying to get to North Carolina for a job. The officer responded by telling Beck that he was just trying to learn whether Beck had any firearms or drugs in the car. Beck responded, "No, no."

More discussion followed, and the officer, in Beck's presence, called for a drug dog. After the dog and his handler arrived, Beck and the officers talked about whether Beck would consent to a search. An officer told Beck that no search would occur if Beck refused consent, but they would lead the dog around the Buick. Beck then replied, "Well, no" in response to the question of whether Beck would permit searching. At that point,

Beck was directed to get out of his car and stand next to the road. Beck complied, and police led the dog around the Buick.

The dog alerted to a door. An officer then gave Beck his *Miranda* rights, and Beck answered "yes" when asked whether he had anything illegal in the car. Beck indicated toward a briefcase. A search of the briefcase revealed methamphetamine. A later search of Beck's person also revealed methamphetamine.

The Court of Appeals found that Beck's detention became unlawful after the officer had completed the traffic stop and when police ordered Beck from his vehicle. The court found that the following seven factors relied upon by the officer for "reasonable suspicion" were insufficient: (1) Beck was driving a rental car rented by an absent third party; (2) the Buick was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage was apparent in the passenger compartment of the car; (5) Beck was nervous; (6) Beck's trip from a drug source state to a drug demand state; and (7) the officer's disbelief that Beck's real reason for the trip was to find work as a truck driver in North Carolina.

The Court of Appeals found that none of these factors alone or together warranted detention. First, there is nothing inherently suspicious about driving a rental car rented by a third person. Second, while geography is not irrelevant, the "source" state—California license factors were "extremely weak" as objective evidence of suspicious conduct. Third, the presence of fast food wrappers was consistent with innocent conduct. Fourth, the absence of luggage in the passenger compartment was consistent with innocent conduct. Fifth, the officer's subjective belief of nervousness justified only "minimal" suspicion. Sixth, Beck's story that he was traveling to find a job as a truck driver was not "inherently suspicious."

### B. This Case

The facts here are similar to those of the *Beck* case. In the early afternoon of November 10, 1997, a Nebraska state trooper observed a car going 72 miles per hour on the

interstate highway. The speed limit was 65 miles per hour. Accordingly, the trooper stopped the car for speeding.

The car stopped without incident. It was driven by the defendant, who was the only occupant of the car. The defendant gave the trooper a Minnesota driver's license in the name of "Donald Eugene Wilson" and a rental car agreement in the name of "Don Wilson." The agreement showed the vehicle had been rented by Wilson in Las Vegas, Nevada, on November 9, 1997, and that it was due in Minnesota on November 12, 1997.

The trooper explained the reason for the stop and asked where the defendant was coming from. The defendant told the trooper he was coming from Las Vegas and was going to Minneapolis. The trooper then instructed the defendant to accompany the trooper to the police car. On their way to the car, the trooper asked whether the defendant had any pocket knives and the defendant responded in the negative.

As the two men sat in the cruiser, the trooper questioned the defendant about his trip. The defendant told the trooper he had flown to Las Vegas on November 9, 1997, and left the same day. He told the trooper that he had gone to Las Vegas to pick up his teenage niece and drive her to Denver because "they don't want her to fly."

The trooper then began a driver's license check via the radio. While completing the check, the trooper asked the defendant his occupation, and the defendant replied that he was a locksmith. The trooper then pursued again the defendant's trip to Las Vegas. He asked the cost of the airfare, and the defendant replied that it was $172. The trooper then suggested that perhaps the defendant had flown to Las Vegas on November 8th. The defendant responded positively, but then corrected himself and stated that he had flown to Las Vegas on the 9th and had left that same day.

In response to more questions, the defendant explained that he flew to Las Vegas to save time. He added that his niece's mother was a nurse and could not get away to pick up her daughter. The trooper then left the

cruiser to check the "VIN" number of the rental car.

Upon returning to the cruiser, the trooper asked more questions, and the defendant answered them. He told the trooper that his niece lived in Lakewood, Colorado, that the defendant was a locksmith and had been so employed since 1991 or 1992, and that he had previously been a welder.

At that point, the trooper received a radio dispatch. The dispatch indicated that there were no wants or warrants for Donald Wilson and that "Donald Wilson" did not have a criminal record or a suspended license. The trooper gave the defendant a warning ticket, told him to observe the speed limit, and returned the defendant's papers to him. The trooper added that he would "get [him] back on [his] way." However, the trooper did not mean what he said.

On the contrary, the trooper then asked whether the defendant had large amounts of cash in the car. The defendant said no. The trooper asked whether the defendant had guns in the car, and the defendant said no. The trooper then asked whether the defendant had drugs in the car, and the defendant replied negatively.

After that, the trooper asked for permission to search the car. The defendant said no, and began to open the cruiser door. The trooper called the defendant back into the car, and asked again about large amounts of cash or guns, and the defendant answered negatively.

The trooper then radioed for a drug dog. While the two men waited for the drug dog to arrive, the trooper again asked for permission to search the car, and again the defendant replied negatively. The defendant then asked to leave, and the trooper told the defendant he must wait until the dog arrived. The trooper asked more questions and the defendant told the trooper that his "locksmith's stuff" was in the trunk of the car. The trooper asked more questions about contraband until the defendant indicated that he was unwilling to answer any more questions. Twenty three minutes later the dog arrived, and the two troopers ultimately searched the

car.[1] Among the items found were a handgun, a police scanner, and a duffel bag containing many $20 bills.

The government argues that the trooper had an "articulable suspicion" based upon "particularized facts" warranting a belief that a crime had been committed, and detention was warranted. Specifically those facts were: (1) the defendant was coming from the Southwest and a large part of the drug trade originates in the Southwest; (2) the defendant was driving to Minneapolis and that city is a common destination for drugs; (3) the defendant was driving a rental car; (4) the defendant's stated purpose and reason for travel appeared unreasonable; (5) the short duration of the trip appeared unreasonable; and (6) the way the defendant acted suggested that he was being deceptive—that is, the defendant exhibited some "kinesic" factors, liking touching his nose, that suggested the defendant was lying.

Even a cursory comparison of the facts of this case and the facts of *Beck* show that the facts of this case are even weaker than the facts found insufficient in *Beck*. The "source" and "destination" facts are too inclusive to raise an objective suspicion; that is, many perfectly law-abiding citizens drive from the Southwest to Minneapolis. The fact that the defendant was driving a rental car is also perfectly consistent with law-abiding activity. In fact, the name match between the driver's license and the rental car agreement and the match between the rental agreement (the place of rental and return) and the defendant's story dispels, rather than creates, suspicion. Still further, and contrary to the officer's suggestion, there was nothing odd about the defendant's explanation of his trip. Uncles very frequently help their nieces just like (as in *Beck*) some truck drivers from California rent cars to look for work in North Carolina. Also, the duration of the trip—four days—in relationship to the reason for the trip was not suspicious. Finally, the act of touching one's nose, and the like, hardly suggests criminal behavior.

In summary, the trooper acted on a "hunch." His speculation was not based

upon objective facts that would have caused a reasonable police officer to believe that a crime had been committed. Hunches, even if they prove correct, are not enough. Judge Piester was entirely correct in recommending suppression.

## II.

The government does not specifically object to Judge Piester's factual findings, save one. The government urges the court to hold an evidentiary hearing to allow the government to present additional evidence clarifying Judge Piester's "factual misunderstanding" about a conversation the dog handler had with the trooper who stopped the defendant.

The evidence at the suppression hearing established that after Trooper Hattan (the dog handler) told Trooper Bigsby (the trooper who initially stopped Kirkpatrick) that the dog had shown "an interest" in a bag in Kirkpatrick's back seat, Bigsby told Kirkpatrick that "[t]he dog's alerting on the ... bag on the back seat," after which the troopers began to search the bag and trunk. (Ex. 2, Transcript of Nebraska State Patrol Recording of Kirkpatrick's Traffic Stop, at 31 & 32.) The testimony at the hearing was that while the terms "alert," "indicate," and "interest" all have specific and different meanings to police service dog handlers, Hattan did not use the term "interest" in its technical sense when conversing with Bigsby; rather, Hattan used "interest" to mean "alert." (Tr. 435:3–7.) Thus, Bigsby had a reason to search the car because he believed the dog had "alerted."

Judge Piester concluded it was "difficult to believe that an experienced police service dog handler such as [Hattan] would use those terms of art so carelessly with a fellow officer in the course of describing the execution of an exterior sniff in the course of duty" and it is "reasonable to infer that Bigsby is familiar with the distinctions between those terms." (Filing 29 at 7.) Thus, Judge Piester concluded that when Trooper Hattan told Trooper Bigsby the drug dog had shown an "interest"

---

1. What happened after the dog arrived is not relevant to the issue discussed in the text because the unlawful seizure had already occurred. Accordingly, I will not discuss those facts.

in the bag in the back seat of Kirkpatrick's car, both Hattan and Bigsby understood and used "interest" as a term of art; that is, something less than an "alert." (Filing 30, Govt's Obj. Magistrate's Recommendation.)

While the government admits that Judge Piester's "misunderstanding" of this evidence pertains only to the result of the dog search and to whether probable cause existed to continue the search, the government argues that Judge Piester must have also concluded that Bigsby (the first trooper) lied about the facts of the initial detention. Therefore, the government fears that this assessment of the trooper's credibility and character must have influenced Judge Piester's evaluation of Bigsby's other testimony regarding reasonable articulable suspicion. (Br. Supp. Govt's Obj. Magistrate's Recommendation at 8.) Consequently, the government requests an evidentiary hearing to consider additional evidence on this point because "the magistrate's interpretation of this evidence could not fairly have been anticipated" and this issue arose on the final day of the suppression hearing when Trooper Bigsby was not available to testify. (Br. Supp. Govt's Obj. Magistrate's Recommendation at 2 & 5.)

I will deny the government's request to convene a supplemental hearing to consider additional evidence on the dog-handling issue. I do so for two reasons. First, pursuant to NELR 72.4, the government has not shown good cause why additional evidence on this issue was not adduced before the magistrate judge (on another day when pertinent witnesses were available, for example). Secondly, and more important, in light of my finding that Trooper Bigsby lacked reasonable suspicion to detain Kirkpatrick anew after their encounter became nonconsensual based on the information known to Bigsby *at that time* (i.e., the dog-handling issue did not arise until after the unlawful detention), additional testimony on the dog issue is irrelevant. To be clear, if I give the exchange between the two police officers the meaning attributed to it by the government, my decision would be precisely the same.

For the above reasons, I conclude that Magistrate Judge Piester's Recommendation should be adopted, the government's objec-

tions should be denied, and the defendant's motion to suppress should be granted.

Accordingly,

IT IS ORDERED:

1. the Magistrate Judge's Recommendation (filing 29) is adopted;

2. the government's objections to the Recommendation (filing 30) are denied;

3. the defendant's "Adoption of Magistrate's Report and Recommendation" (filing 31) is denied as moot; and

4. the defendant's motion to suppress (filing 17) is granted.

### REPORT, RECOMMENDATION, AND ORDER

PIESTER, United States Magistrate Judge.

Pending before the court is Defendant's motion to suppress. (Filing 17). For the reasons discussed more fully below I shall recommend that the motion be granted.

On November 20, 1997 a grand jury indicted Defendant William Kirkpatrick on one count of possession of a firearm with defaced serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B), and one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant has filed a motion to suppress evidence obtained as a result of a search of his vehicle on November 10, 1997 as well as all statements following his illegal detention and interrogation. (Filing 17). On January 29, February 9, and February 19, 1998 the court held a hearing on the motion.

### BACKGROUND

In the early afternoon of November 10, 1997 Trooper Christopher Bigsby of the Nebraska State Patrol ("NSP") was parked in the median of Interstate 80 ("I–80") at mile marker 395 near Lincoln, Nebraska. At approximately 12:50 p.m. he clocked Defendant's eastbound Ford Taurus with his radar unit at 72 miles per hour. The posted speed limit at that location on I–80 is 65 miles per hour. Bigsby turned around and pursued the Taurus. Defendant pulled over onto the

right-hand shoulder of the road and came to a stop. Bigsby parked behind the vehicle. A camera mounted inside Bigsby's vehicle had been activated during the pursuit and was pointed at the rear of Defendant's vehicle. The camera recorded the ensuing events on videotape. (*See* Exhibit 1). Also, a wireless microphone was clipped onto Bigsby's uniform. A transcript prepared from the sound recording of the stop was received into evidence at the hearing. (*See* Exhibit 2).

Bigsby approached the driver's side of Defendant's vehicle. Defendant was the sole occupant of the Taurus. Bigsby asked to see Defendant's driver's license and registration. Defendant produced a Minnesota driver's license in the name of Donald E. Wilson. (*See* Exhibit 202). In lieu of a registration, Defendant produced a rental agreement for the vehicle in the name of Don Wilson. (*See* Exhibit 4). The rental agreement showed that the vehicle had been rented in Las Vegas on November 9, 1997 and was due in Minneapolis on November 12, 1997. (Exhibit 4). Bigsby explained the reason for the stop and told Defendant that he would receive a written warning. Bigsby also asked Defendant where he was coming from and his destination. Defendant told Bigsby that he was coming from Las Vegas and going to Minneapolis. Bigsby then asked Defendant to join him in the patrol car. On their way to the patrol car, Bigsby asked Defendant if he had any pocket knives on his person. Defendant responded in the negative.

As Bigsby and Defendant sat in the patrol car, Bigsby engaged Defendant in further conversation about his trip. In response to Bigsby's questions, Defendant explained that he had flown to Las Vegas on November 9, 1997 and had left the same day. He told Bigsby that he had gone to Las Vegas to pick up his sixteen year-old niece and drive her to Denver because "they don't want her to fly . . . ." (Exhibit 2 at 5). At that point in the conversation Bigsby radioed dispatch to run a check on Defendant's driver's license. Bigsby asked Defendant about his occupation and Defendant told him that he was a locksmith. Bigsby then resumed his questioning about Defendant's trip to Las Vegas. In response to Bigsby's question about the cost

of the flight to Las Vegas, Defendant explained that the airfare was $172. When Bigsby asked Defendant if he had flown into Las Vegas on November 8th, Defendant agreed at first but immediately corrected himself by saying that he had flown in and left on the same day, Sunday, November 9. In response to continued questions about his travels, Defendant explained that flying out to Las Vegas was more convenient than driving, in terms of the time he would save. Defendant elaborated by telling Bigsby that his niece's mother was a nurse and could not get away to pick up her daughter. Bigsby then exited his vehicle to check the V–I–N number on the dashboard of the Taurus against the federal identification number on the inside of the driver's door.

Upon returning to the patrol car, Bigsby continued to ask Defendant questions about his niece and his trip. Bigsby asked Defendant where his niece lived. Defendant explained that his niece lived in Lakewood, Colorado and that he was doing her a favor. Bigsby also inquired about how long Defendant had been a locksmith and asked about previous jobs. Defendant said that he had been a locksmith since 1991 or 1992 and that he was a welder before that time. Prior to preparing a written warning, Bigsby received information from dispatch that no wants or warrants existed for Defendant under the name on his driver's license, Donald Wilson. Further, dispatch notified Bigsby that "Donald Wilson" did not have a criminal history or a suspended driver's license. When Bigsby finished the warning ticket he reminded Defendant to observe the speed limit and returned Defendant's papers along with the ticket. At that time Bigsby told Defendant that he would "get [him] back on [his] way." (Exhibit 2 at 11).

In spite of this statement to Defendant, Bigsby did not allow Defendant to exit the patrol car after the warning ticket had been completed. Instead, the following conversation took place.

BIGSBY: Don, just got one more question for ya, and I wouldn't be doing my job if I didn't ask. You don't have any large amounts of cash up in your vehicle, do you?

DEFENDANT: No. Uh Huh. [sic]

BIGSBY: Do you have any guns up in your car?

DEFENDANT: No, I sure don't.

BIGSBY: Do you have any marijuana up in your car?

DEFENDANT: No.

BIGSBY: Cocaine? Anything like that?

DEFENDANT: No.

BIGSBY: Can I search your vehicle?

DEFENDANT: Well, I don't want you to search it, you know, I'm just, I'm gonna get off and get something to eat up here . . .

BIGSBY: Okay.

DEFENDANT: . . . and, uh, I don't wanna be . . . Can I go now?

BIGSBY: Well . . .

DEFENDANT: (Unintelligible).

BIGSBY: . . . can I search your vehicle, sir?

DEFENDANT: No, I don't want you searching my vehicle.

(Exhibit 2 at 11–12). At that point, Defendant opened the door and began to exit the patrol car. Bigsby called him back into the car and continued to ask him whether he had large amounts of cash or guns in his car. Defendant again responded in the negative. Bigsby then radioed dispatch and requested a canine unit.

While Defendant and Bigsby waited in the cruiser for a canine unit to arrive, Bigsby continued to ask for consent to search the Taurus. Defendant indicated at one time that Bigsby could look in the backseat; however, when Bigsby continued to pressure Defendant to consent to a search of the trunk, Defendant told Bigsby that he did not want any area of his car searched. Defendant again asked if he could leave. Bigsby told Defendant that they would wait until the canine unit arrived, then continued to ask about cash, drugs, and alcohol. When Bigsby asked about the contents of the trunk of the Taurus, Defendant said that it contained his "locksmith's stuff." (Exhibit 2 at 15, 18). Bigsby told Defendant that the police service dog was "trained in the . . . areas of . . .

drugs and currency and guns" and would run around Defendant's vehicle. (Exhibit 2 at 19). Bigsby continued to ask about contraband until Defendant indicated that he was not willing to answer any more questions.

Trooper Paul Hattan and his police service dog, Mike, arrived approximately 23 minutes after Bigsby radioed for a canine unit. Bigsby explained to Hattan that Defendant had refused to give consent to search the vehicle but that there were "a lot of indicators . . . that there's criminal activity going on. . . ." (Exhibit 2 at 30). Hattan deployed Mike to conduct an exterior sniff of Defendant's vehicle. When Hattan walked Mike around the Taurus to the driver's side, Mike jumped into the vehicle through the open window in the driver's door. Once inside, Mike proceeded to the back seat where he circled. Hattan also noted that Mike's breathing became more intense and nasal and that he was raising and lowering his head. (Tr. 346:9–12; 422:22–24). At the hearing Hattan testified that those are behavioral changes that he, as Mike's handler, knows to be signs that Mike has possibly detected the odor of drugs. Hattan explained that such subtle reactions displayed by Mike during the course of a search are referred to as an "alert." (Tr. 345:3–11).

Hattan called to Mike and Mike jumped back out of the car and resumed the search pattern with his handler. When the two came back around the Taurus to the driver's side, Mike again jumped into the vehicle and climbed into the back seat. According to Hattan's testimony, Mike "became very nasal, placed his nose down in the crack of the seat, and was all—had his nose all over the bag and then proceeded to start to bite and try to tear the bag." (Tr. 429:22–25). Such behavior is known as an "indication" by the dog of the presence of the odor of contraband. Hattan testified earlier that Mike is trained to be an aggressive indicator, meaning that he will scratch, bark, or bite when he pinpoints the strongest odor of the drugs he is trained to detect. (Tr. 344:17–22). Hattan again called Mike out of the car.

After concluding the exterior sniff of Defendant's vehicle, Hattan contacted Bigsby. Hattan told Bigsby that Mike had "show[n]

an interest in the bag and that's it." (Exhibit 2 at 31). Hattan was referring to a bag located on the back seat of the Taurus. On cross-examination Hattan was asked to describe how Mike might "show an interest" in an area. (Tr. 387:18–19). Hattan testified that "[Mike] might walk over to an area where, say, another animal might have urinated or something and put his nose down, smell around that area, and then—and then leave it." (Tr. 387:20–23). Hattan admitted that several other "diversions" could cause Mike to "show an interest" in an area. (Tr. 387:24–388:3).

Hattan testified that the terms "alert," "indicate," and "interest" have specific meanings to him as a police service dog handler; however, he was not using those terms in their technical sense when he spoke with Bigsby following the exterior sniff of Defendant's vehicle. Rather, he testified, when he told Bigsby that Mike had shown an interest in the bag, he meant that Mike had " 'alerted' and 'indicated' to the presence of drugs." (Tr. 435:3–7). Hattan never used either the term "alert" or the term "indicate" to Bigsby when describing the dog's actions.

Contrary to Hattan's testimony, I find it difficult to believe that an experienced police service dog handler such as he would use those terms of art so carelessly with a fellow officer in the course of describing the execution of an exterior sniff in the course of duty. No testimony was adduced as to Bigsby's understanding of the technical use of the terms, "alert," "indicate," and "interest"; however, he estimated that he had worked with Hattan and Mike on five to ten previous occasions. (Tr. 97:3–6). Given his eight years with the Nebraska State Patrol and his experience with canine units, it is reasonable to infer that Bigsby is familiar with the distinctions between those terms. In spite of Hattan's statement to him that Mike had "show[n] an interest in the bag and that's it," Bigsby told Defendant that the dog had "alerted" on the bag in the back seat and that they were going to search the car's trunk as well as the bag. (Exhibit 2 at 31–32).

1. A complete list of items found is contained in

Bigsby began his search of the Taurus with the passenger compartment. He opened a bag in the back seat and found several items including a police scanner, a portable recharger, lock-picking tools, hundreds of keys, and a "large key-making device." (Tr. 113:6–12).[1] Bigsby found a backpack and a coat in the front seat. When he opened the trunk he found two large footlockers, a soft-sided suitcase, and a fanny pack. Although the footlockers were locked with padlocks, Bigsby was able to open one enough to see that it contained a black duffel bag. Among the items found in the fanny pack were a loaded 9mm handgun, another police scanner, a plastic security badge, and earplugs. At Bigsby's request, bolt cutters were brought to the location of the stop. The padlock on one of the footlockers was cut open revealing a duffle bag filled with a large number of $20 bills. At that point, Bigsby directed Hattan to handcuff Defendant. Defendant and his vehicle were transported to the NSP traffic office for further investigation, which, in turn, led to the present charges being filed.

## DISCUSSION

### (1) INVESTIGATORY DETENTION

"Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994) (citing *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir.1993); *United States v. Richards*, 967 F.2d 1189, 1192–93 (8th Cir.1992)), *cert. denied*, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). Further inquiry, however, is limited: "An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir.1997). "If reasonably related questions raise inconsistent answers,

Exhibit 5.

or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions." *Ramos,* 42 F.3d at 1163.

In this case Trooper Bigsby stopped the Taurus after observing a moving violation. Thus, the initial traffic stop was legitimate. *See Barahona,* 990 F.2d at 416 ("It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.") (citing *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991)). Furthermore, Bigsby's decision to have Defendant sit in the patrol car while he ran a check on Defendant's driver's license and asked him questions about his travels were within the scope of a reasonable traffic stop investigation. *See Ramos,* 42 F.3d at 1163.

The reasonable scope of the initial traffic stop extended up to the point when Bigsby asked Defendant for consent to search the vehicle. *United States v. Bloomfield,* 40 F.3d 910, 916 (8th Cir.1994), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v. White,* 42 F.3d 457 (8th Cir.1994). Reasonable suspicion analysis must consider the factors known to Bigsby at the time he expanded the scope of the initial traffic stop, not in isolation, but as a totality. *Bloomfield,* 40 F.3d at 918. "[A] series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." *United States v. Weaver,* 966 F.2d 391, 394 (8th Cir.1992), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

Bigsby's check of Defendant's driver's license, in the name of Donald Wilson, showed no wants or warrants, no suspended license, or any criminal history. In spite of the absence of any negative results of the check, Bigsby testified that he "felt that there was criminal activity going on, based upon what [he] had seen and heard." (Tr. 52:15–16). According to his testimony, Bigsby's decision to expand the scope of the traffic stop by asking Defendant for consent to search and ultimately calling for a canine unit was based

on a number of observations that he characterized as "indicators of criminal activity."

Bigsby testified that his suspicions were raised by the circumstances surrounding Defendant's trip. First, Bigsby was concerned with the cities that comprised Defendant's travel itinerary. Bigsby testified that according to his training and experience, Las Vegas, based on its location in the southwestern United States, and its gambling business, has a reputation as a source of illegal drugs and money laundering. Furthermore, he testified that Denver is a known destination and distribution area for drugs and currency, while the Minneapolis area is considered to be a destination for drugs and an origination city for money.

Second, Defendant's mode of travel and the duration of his trip were additional factors considered to be significant by Bigsby. Defendant told Bigsby that he had flown into Las Vegas, rented a car, and left on the same day. The rental agreement (exhibit 4) showed that the vehicle was due three days later. Bigsby testified that he believed, based again on his training and experience, that flying one way and driving back in a short period of time are indicative of transporting drugs and currency. The fact that Defendant was driving a rental vehicle was another consideration. Bigsby testified that individuals transporting contraband prefer to use rental cars because they are generally newer vehicles, attract less attention, cannot be seized in a forfeiture action, and are more difficult to trace to third parties.

Third, Bigsby also based his belief that criminal activity was afoot on his opinion that Defendant's reason for travel was unreasonable. Specifically, Bigsby felt that Defendant's stated purpose for his trip was unreasonable in light of the costs incurred. Defendant told Bigsby that his flight to Las Vegas cost $172 and Bigsby noted from the rental agreement that the cost of renting the Taurus for the three-day return trip was nearly $124. Bigsby testified that taking into account the additional expenses of gasoline, food, and lodging, he estimated that the trip cost Defendant a minimum of $500. According to Bigsby the cost of the trip did not

correspond with Defendant's stated purpose of travel, chauffeuring his sixteen year-old niece from Las Vegas to her home near Denver.

In addition to the circumstances surrounding the trip, Bigsby testified that his belief that Defendant was engaged in criminal activity was based, in part, on Defendant's verbal and nonverbal responses to his questions. More precisely, Bigsby concluded that Defendant was being deceptive based on Bigsby's interpretations of those responses. His analysis of Defendant's behavior was based on skills he had acquired during a three-day training course on kinesic interviewing and interrogation techniques that he attended in May 1996. For example, Bigsby testified that Defendant touched his nose on at least two occasions during the stop. That particular gesture was described by Bigsby as a stress response commonly exhibited by individuals attempting to be deceptive. In addition, Bigsby testified that Defendant showed a lack of a clear thought train and attempts to generate answers, demonstrated by his yawning and the use of the vocal filler, "uh." Bigsby also testified that changes in the volume of Defendant's responses to his questions about the presence of contraband were consistent with deception. That is, Defendant's denial to the inquiry about large amounts of currency was lower in volume than his subsequent denials to questions about various controlled substances.[2]

In determining whether the factors cited by Bigsby gave rise to a reasonable articulable suspicion to support the continued detention of Defendant, I shall exclude Bigsby's observations of the so-called "kinesic factors." First, I have serious reservations about the usefulness of the so-called "kinesic interviewing techniques" as a method of detecting deceit. A touch of a finger to the nose, a lean, a change in voice inflection, use of the filler "uh," or any other of the supposedly significant observations made by Bigsby were not demonstrated to have any reliability whatsoever. No evidence was adduced to show the source of the method, a record of objective testing of the method or any standard of predictability applicable to its use.[3] No case has been found or presented which approves use of the method. I recognize that Trooper Bigsby may have had a subjective belief in the reliability of the observation technique, but that is not the issue; rather, I must determine whether his subjective belief was objectively reasonable. It was not shown to be objectively reasonable. At best, it was shown to be only a means to support an officer's otherwise-rationalized subjective hunch. See Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That is not reasonable suspicion based on articulable facts.

Second, Bigsby's use of the technique was not shown to be in compliance with its standards. On lengthy cross-examination, he admitted his only training in the methods occurred during a three-day seminar more than a year before this stop, nor did he claim to be an expert on kinesic interviewing and interrogation techniques. While there was testimony that he successfully completed that seminar, there was no evidence that he obtained proficiency in the use of the technique by national, standardized, objective testing, nor that he remained proficient in using the technique in November, 1997. He admitted

---

2. According to his testimony, Bigsby also relied on Defendant's statement that he had "locksmith stuff" in the car (Exhibit 2 at 15, 32); the fact that Defendant did not offer the exact address of his niece in Lakewood, Colorado; and the fact that Defendant leaned and tried to exit the cruiser after he second refusal of consent. However, these pieces of information did not come to Bigsby's attention until after he had expanded the scope of the traffic stop; therefore, they cannot be used to support a finding of reasonable suspicion.

3. I recognize that the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 506 U.S. 914, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992), do not apply in this context. If they did, this method of interviewing, at least as it was explained in this hearing, would fall in the category of "junk science." I do not intend to convey that the method can never have any usefulness; indeed, if shown to be reasonable and reliable, and if shown to be properly used, it might provide a reasonable interpretation of a suspect's movements and reactions to an officer's questions, and so augment demonstrated facts considered by an officer in articulating reasonable suspicion. However, the record before me leaves serious doubt that an adequate showing of its reliability could ever be made.

that the atmosphere and surroundings in his cruiser were not conducive to using the technique. (Tr. 211:19–22). In fact, the training course primarily focussed on station house interviews rather than roadside stops. (*See* Tr. 218:14–17). Bigsby conceded that many distractions exist during a roadside interview that do not exist under more ideal conditions and that those distractions must be taken into consideration. When pressed to elaborate on how he accounted for those distractions during his encounter with Defendant, he was unable to do so. He admitted he did not ask a number of innocuous questions to establish a consistent "baseline" of behavior against which to observe defendant's reactions to more sensitive questions. He admitted he could not remember and did not record even the subject of the questions that prompted the defendant to make what Bigsby considered significant movements, nor whether they were before or after his decision to call the canine unit. (*See* Tr. 226:1–13). Moreover, Bigsby testified that the observed behaviors are not significant or meaningful in isolation but rather "clusters or multiples" of those seemingly innocuous behaviors may be characteristic of deception when they are in response to relevant questions. Bigsby testified that during his routine questioning of Defendant he observed such clusters; however, when asked give an example, he was unable to provide any that took place prior to his expansion of the scope of the traffic stop. (*See* Tr. 84:12–85:3). For the reasons stated above, I conclude that the kinesic factors described by Bigsby cannot be considered in the reasonable suspicion analysis.

The remaining factors to be considered for a determination of reasonable suspicion include: 1) the reputations of the metropolitan areas on Defendant's travel itinerary as source and destination cities for contraband; 2) the one-way flight and use of a rental car for the return trip; 3) the short duration of travel; and 4) Bigsby's opinion that Defendant had an unreasonable reason for travel in light of the cost of his trip. Neither of the parties; in their briefs or closing arguments, cited a case in which a court addressed a set of circumstances identical to those in the case currently before the court. Likewise, my research did not uncover any such cases. In fact, a review of Eighth Circuit case law reveals a case-by-case approach to this issue. As such, a discussion of a few cases that provide guidance in this determination follows.

In *United States v. Bloomfield, supra,* the court held that the officer had a reasonable suspicion that the defendant was transporting drugs when he asked for consent to search the defendant's rental truck. *Bloomfield,* 40 F.3d at 918. The court cited six factors supporting reasonable suspicion: 1) the defendant's extreme nervousness; 2) the strong "masking odor" emanating from the rental truck; 3) the defendant was carrying a pager; 4) the defendant opened the door of the truck only slightly and squeezed out; 5) the defendant evaded the officer's question about his employer; and 6) the defendant refused to answer one of the officer's questions about his destination. The court held that "the sum of [the officer's] observations examined in light of his training and experience constitute a reasonable, articulable suspicion that Bloomfield's rental truck contained drugs, justifying the seizure and detention of Bloomfield and the truck." *Id.* at 919. In *United States v. White, supra,* the court found reasonable suspicion based on defendant's nervousness; defendant did not know the address where he was to deliver his cargo; defendant had no bill of lading or permit for transporting the goods he was carrying; defendant claimed to be making delivery for his employer but the truck was rented in his name for cash; a laser detector, radar detector, and ham radio were visible in the cab of the truck; defendant was traveling from known source cities for drugs; and defendant lied to officer about the number and contents of boxes behind the driver's area of the truck. In *United States v. Pollington,* 98 F.3d 341 (8th Cir.1996), reasonable suspicion justified expansion of the scope of the traffic stop when the officer smelled laundry detergent, commonly used to mask the odor of drugs; defendant appeared nervous; and the officer did not believe the driver's story that he and the defendant "had borrowed a gas-guzzling motor home to take a weekend trip from Michigan

to Las Vegas" in order to avoid leaving their wives without transportation. *Id.* at 343. In *United States v. Barahona, supra,* reasonable suspicion justified extended detention of defendant when officer was unable to verify defendant's driver's license; car was rented under another name; and dates on the rental contract indicated that defendant was making a long distance trip in a unusually short period of time. In *United States v. Carrate, supra,* the court cited seven factors supporting reasonable suspicion: "(1) [the defendant] was not the owner of the vehicle, (2) [the defendant] was in route from California to Illinois, (3) California is a point of origin for illegal drugs, (4) Chicago is a common destination for the shipment of illegal drugs, (5) [the defendant] had very little clothing in the car to suggest a legitimate trip, (6) the six year-old car had high mileage, and (7) [the defendant] had a prior criminal record in California." *Id.* at 669.

In contrast, the court in *Unites States v. Ramos, supra,* held that the continued detention of the defendants during a traffic stop was a violation of the Fourth Amendment. *Ramos,* 42 F.3d at 1164. The defendants' truck was stopped when a law enforcement officer observed that the passenger was not wearing a seat belt. "The [defendants] were cooperative, their licenses were clean, the truck was not stolen, their answers about their destination were consistent, and [the passenger] had a reason for not wearing his seat belt—a colostomy bag." *Id.* at 1163. The court disagreed with the district court's conclusion that reasonable suspicion existed based "on the facts that the vehicle was on an interstate highway with out-of-state plates,[4] and that [the defendants] were not certain about the part of Chicago that was their destination." *Id.*

While the case currently before the court shares some of the factors noted by the Eighth Circuit in those cited cases in which reasonable suspicion was found to exist, Defendant's circumstances can be easily distinguished. Defendant did not appear nervous during the traffic stop; in fact, he was initially cooperative with Bigsby's questioning. The names on Defendant's driver's license and the rental agreement matched. In addition, although the name "Donald Wilson" was later discovered to be an alias, the check of Defendant's driver's license resulted in no negative information. Bigsby did not detect any masking odors coming from Defendant's vehicle. He did not see any pagers, scanners, or radar detectors prior to his unconsented search of the Taurus. Finally, in spite of Bigsby's disbelief of Defendant's stated purpose for his trip, no inconsistencies existed between the circumstances known to Bigsby at the moment he asked for consent to search and the "story" offered by Defendant.[5]

Based on the foregoing, I conclude that the sum of Bigsby's observations examined in light of his training and experience did not constitute a reasonable, articulable suspicion that Defendant was engaged in criminal activity. Therefore, the continued seizure and detention of Defendant and his vehicle was not justified. *See Bloomfield,* 40 F.3d at 919.

### (2) SEARCH OF THE VEHICLE

The exterior sniff of Defendant's vehicle conducted by police service dog Mike and his handler, Trooper Hattan, occurred without Defendant's consent and after the stop had exceeded the reasonable scope of a traffic stop. As such, the outcome of the exterior sniff and the subsequent search of Defendant's vehicle was the result of an illegal detention and must be suppressed.

This result cannot be avoided by reliance on case law holding that a dog sniff is not a Fourth Amendment search. "[A] dog sniff of a car that is parked on a public street ... is so limited an intrusion on protected privacy interests as to not amount to a search for Fourth Amendment purposes." *United States v. Friend,* 50 F.3d 548, 551 (8th Cir.1995), *vacated on other grounds,* 517 U.S. 1152, 116 S.Ct. 1538, 134 L.Ed.2d 643

---

**4.** Defendant's truck had a Texas license plate.

**5.** Defendant's description of the route and timing of his trip was consistent with information on the rental agreement. Furthermore, Defendant's lo-

cation on I–80 in Nebraska was in no way inconsistent with either his story or the rental agreement.

(1996). In *Friend* a drug detection dog alerted to the door seam of a car parked between an alley and the garage of the defendant's residence. In holding that such an exterior sniff of a parked vehicle was not a search, the court quoted the following Supreme Court discussion:

> [T]he canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here— exposure of the respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

*Id.* (quoting *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)).

▪ The circumstances surrounding the exterior sniff of Defendant's vehicle are vastly different from those in *Friend*. Defendant's vehicle was not parked on a public street. It had come to a rest on the side of an interstate highway pursuant to a traffic stop. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of . . . [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Defendant's vehicle was seized during the reasonable scope of the traffic stop. Moreover, in light of my conclusion that Bigsby lacked reasonable suspicion to expand the stop, Defendant's vehicle was seized in violation of the Fourth Amendment when the exterior sniff was conducted. For the reasons stated above, the outcome of the exterior sniff and the subsequent search of Defendant's vehicle must be suppressed.

### (3) *MIRANDA* WARNINGS

Defendant argues that he was "detained and interrogated, without *Miranda* warnings," after Bigsby handed him the warning ticket. (Defendant's brief at 7). The prosecution may not use statements obtained from a defendant during custodial interrogation in the absence of certain procedural safeguards. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda* the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*

The Supreme Court has held that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The Court discussed the similarity between ordinary traffic stops and *Terry*[6] stops with respect to their noncoercive nature. In light of my conclusion that the continued detention of Defendant was not based on reasonable suspicion, Defendant was not detained pursuant to an "ordinary" traffic stop once Bigsby made the request for consent to search.

▪ The Eighth Circuit opinion in *Ramos*, obviates the need to determine whether any subsequent interrogation of Defendant was "custodial" according to the lengthy analysis prescribed in *United States v. Griffin*, 922 F.2d 1343 (8th Cir.1990). "As we understand the Supreme Court's cases, statements that result from an illegal detention are not admissible." *Ramos*, 42 F.3d at 1164 (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Therefore, any statements made by Defendant after the scope of the original traffic stop was expanded are barred by the exclusionary rule.

### CONCLUSION

Because the continued detention of Defendant violated the Fourth Amendment, any information obtained as a result of that detention is tainted. Further, the "fruit of the poisonous tree" doctrine requires that all evidence obtained or derived from exploitation

---

6. *Terry v. Ohio, supra.*

of that tainted information is inadmissible under the exclusionary rule. *See generally Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, all evidence found during the illegal search of Defendant's vehicle and statements made by Defendant after the illegal detention are barred by the exclusionary rule. I shall therefore recommend that Defendant's motion to suppress (filing 17) be granted in its entirety.

**IT THEREFORE HEREBY IS REC-OMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that Defendant's motion to suppress (filing 17) be granted in its entirety.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

**FURTHER, IT HEREBY IS ORDERED** that trial of this matter is set before Judge Kopf to commence at 9:00 a.m., June 1, 1998, or as soon thereafter as the case may be called, with jury selection at the commencement of trial. Trial is scheduled for 4 trial days.

Dated March 23, 1998.